964 So.2d 454 (2007)
Brandy HENDRICK, Plaintiff-Appellee,
v.
Johndale HENDRICK, Defendant-Appellant.
No. 42,566-JAC.
Court of Appeal of Louisiana, Second Circuit.
August 22, 2007.
*455 Law Office of Katherine Clark Dorroh, L.L.C. by Katherine Clark Dorroh, Kellie Curry, for Appellant.
Law Office of Joel L. Pearce by Joel L. Pearce, Shreveport, for Appellee.
Susan E. Hamm, for Children A.A.H. and H.V.H.
Before BROWN, GASKINS & PEATROSS, JJ.
PEATROSS, J.
In this juvenile court action, the father, Johndale Hendrick, appeals the trial judge's issuance of a protective order following his determination that Mr. Hendrick sexually abused his minor daughter, A.H. The trial judge awarded sole custody to the mother, Brandy Hendrick, with supervised visitation with her father, restricted by provisions contained in the protective order, which remains in effect until the child's 18th birthday. Mr. Hendrick appeals. For the reasons stated herein, we affirm.

FACTS
The Hendricks were married in 2001 and they had two children, A.H., born in July 2002, and H.H., born in April 2006. The parties physically separated on October 28, 2006. Mr. Hendrick moved out of the matrimonial domicile on that date. Ms. Hendrick testified that her sister, Christy Carroway, was separating from her husband at that time and she and her dog had been living with the Hendricks for several weeks. Initially, Ms. Hendrick thought that Mr. Hendrick was upset that her sister and dog were in the house and that is why he moved out. She soon discovered, however, that he had been engaging in sexually explicit email communications with women in Shreveport; and, when confronted, he admitted to her that he was a sex addict. Ms. Hendrick allowed Mr. Hendrick to stay in the extra bedroom of the home on October 30 due to the cold weather and the fact that the rental house where he was staying had no heat.
On the morning of November 3, 2006, Ms. Hendrick visited her attorney to review and sign a petition for divorce. According to Ms. Hendrick, as she was leaving the attorney's office, she received a call from her sister reporting that A.H. had told her during a bath that morning that her father had abused her. Ms. Hendrick testified that she immediately took the steps to file a Petition for Protection From Abuse, which was filed at 11:41 a.m. The petition alleged that five-year-old A.H. had told a family member that her father had "hurt her private area and sticks his fingers inside of her" and that Mr. Hendrick walked around naked in front of the child on a daily basis. The petition also alleged that Mr. Hendrick was diagnosed with bipolar manic depression and was on medications.
Later on the same day, Ms. Hendrick's Petition for Divorce was filed, seeking joint custody with reasonable visitation for Mr. Hendrick. Mr. Hendrick emphasizes that the Petition for Divorce was filed after the Petition for Protection From Abuse and did not contain any allegations *456 regarding abuse.[1] As stated, Ms. Hendrick testified that she was at her attorney's office that morning and completed the petition for divorce. She further testified that she went back to her attorney's office later in the day to sign the divorce petition, at which time she discussed the abuse allegations and the petition for protection with her attorney. According to Ms. Hendrick, her attorney indicated to her that the abuse allegations could be added later and that the petition should be filed for financial reasons. On his advice, Ms. Hendrick signed the petition as it had been drafted (joint custody and no abuse allegations) and it was filed later that afternoon. Ms. Hendrick asserts that that is the reason there are no allegations of abuse in the divorce petition and no request for sole custody.
Also on November 3, 2006, after she filed the Petition for Protection From Abuse, Ms. Hendrick contacted a social worker at the hospital where she worked and was referred to the Gingerbread House for services to help A.H. Ms. Hendrick took A.H. to the Gingerbread House the following day where she was interviewed by Jennifer Flippo. This interview was videotaped and was viewed by this court during our review of the case and is discussed in detail infra.
Mr. Hendrick filed an answer to the Petition for Protection From Abuse denying any abuse and denying that he walked naked in front of the child on a daily basis. He admitted that he had been diagnosed bipolar and was under treatment; however, he alleged that his recent physical, on November 1, 2006, indicated no depression or anxiety. After several hearing dates during December 2006, the court ultimately held that a prima facie case had been presented, appointed an attorney to represent the child and ultimately granted Mr. Hendrick's request for supervised visitation on December 22.
At the hearing on the petition for protection, Ms. Hendrick testified first. She described the call from her sister and the types of comments A.H. was making regarding her father's actions, specifically that her father "stuck his fingers in her butt" and that he put a hanger up his butt and made it bleed-then put a lemonade tootsie roll on the hanger and ate it with the blood. A.H. also allegedly stated that he put a "pink stick" and a pink hanger in her butt, as well as a pink Barbie fork. Ms. Hendrick testified about the sexual emails, but they were not allowed into evidence and are not at issue on appeal.
Ms. Hendrick further testified that she and Mr. Hendrick were both registered nurses and worked in the same department. Mr. Hendrick's license had previously been suspended for 18 months due to his abuse of narcotic medications.
Of particular significance in this appeal is a writing, or letter, authored by Mr. Hendrick and found in a filing cabinet by Ms. Hendrick as she was going through some papers that belonged to her husband after they separated. This letter was admitted into evidence as P-2 during the hearing on the protective order. The letter had inadvertently not been included in the record in the trial court due to oversight, but was supplemented to this court. The letter was written more than ten years prior to trial while Mr. Hendrick was in drug addiction rehabilitation and it contains thoughts and feelings about addiction and recovery. Mr. Hendrick verified the authenticity of the writing under oath. *457 The substance of the writing reflects that he was preoccupied with inappropriate sexual activity from an early age, indicated by sexual dreams regarding his mother and a sexual attraction to Wendy in Peter Pan at age five. In addition, the writing alludes to sexual activity with a dog and young girls as early as the 5th and 6th grades. Specifically, it refers to a pit bull dog"seventh grade, Lynn's dog, pit bull, Ruby, had sex with her. A few weeks later she became pregnant and he shot her. I blamed myself." Mr. Hendrick testified that Lynn was his brother and that his brother had sex with the dog and later shot her. He blamed himself because he did nothing to stop it. The letter also refers to a clubhouse built by Mr. Hendrick and friends in the 7th grade. Mr. Hendrick agreed that the purpose of the clubhouse was to do sexual things with girls, but he maintained that nothing ever actually happened in the clubhouse. The letter further reveals a pervasive string of drug addiction and addictive behavior throughout his young adulthood. Mr. Hendrick testified repeatedly that he is a recovering drug addict and that he abused multiple drugs until his sobriety date of November 7, 1999. At the time of the hearing, Mr. Hendrick testified that he remained clean and sober since that date.
In her testimony, Ms. Hendrick stated that it was part of the "daily routine" that Mr. Hendrick would bathe with the children. An older son of his testified that, until age 11, he was told to take a shower with his father to conserve water. Mr. Hendrick also bathed with A.H. Ms. Hendrick testified that she thought this was inappropriate and she told him to stop the behavior. There is also testimony that Ms. Hendrick's mother told her that A.H. had made the comment that her daddy had touched her booty; but, as an isolated statement, Ms. Hendrick believed that this was related to Mr. Hendrick's bathing the child. This prompted Ms. Hendrick to tell Mr. Hendrick that the co-bathing should cease. Conversely, Mr. Hendrick testified that, during an 18-month period when A.H. was a toddler and he was unemployed due to suspension of his nursing license, he and Ms. Hendrick agreed that he would stay home and be the primary caregiver of A.H. while Ms. Hendrick worked. He testified that Ms. Hendrick would bring the child to him in the shower and ask him to bathe her so she could get ready for work. He testified that Ms. Hendrick never voiced an objection to his showering with A.H. and he continued to do this until the child was about three years old.
Mr. Hendrick admitted in his testimony that, in 1998 while using drugs, he harassed a former girlfriend by leaving notes, putting bleach in her plants and stealing her computer, gun and cat. He also urinated in her milk and watched her drink it. Eventually, he returned the computer and gun, but kept the cat after telling her that the cat had run away.
In addition, Mr. Hendrick was questioned about the sexual aspect of his addiction. He testified that, as an addict, it was his predisposition to "change the way he feels." According to Mr. Hendrick, this can be through a myriad of behaviors around alcohol, drugs, work and relationships and can have a sexual aspect to it. He used as an example the email correspondence in which he was engaged with several women during his marriage. Mr. Hendrick denied ever having actually met and had physical relations with any of these women. Finally, Mr. Hendrick denied having any inappropriate contact with any of his children. He testified that he cleaned A.H.'s vaginal and rectal areas when changing her diaper or bathing her, but there was never any other contact. He also denied having routinely showered with his older son from his first marriage.
*458 Tunisia Stokes, A.H.'s preschool teacher at Noel Methodist daycare also testified. She described A.H. as a bright and intelligent child. Ms. Stokes had noticed no abnormal behavior from A.H. She testified, however, that she was aware that A.H. had some aggressive problems, was angry and hit other students before Ms. Stokes took over A.H.'s class. She did not witness any of this type of behavior from A.H.; however, she testified that A.H. does have tantrums when she gets in trouble and does not want to go to time out. She further testified that, in June 2006, A.H.'s mother had reported to her that A.H. had stated that another child (whom she specifically named) had touched her private area. Ms. Stokes reported this to her director who, in turn, spoke with A.H. and the other child's parent. Ms. Stokes observed A.H. closely following this accusation and never saw any inappropriate behavior by A.H. or to her. A.H. ultimately recanted this accusation against the other child. Ms. Stokes further testified that, shortly before the hearing, A.H. related to her that her father "stuck a pink stick up her butt" and down her sister's throat. According to Ms. Stokes, A.H. approached her during normal classroom activity and told her that she needed to tell her something. They went to a quiet corner and A.H. made these statements to her. Ms. Stokes testified that this was a spontaneous statement of the child and she did not probe the child for information. Afterward, A.H. sat by herself for a few moments and then resumed her activity. Ms. Stokes stated that A.H. was not crying, upset or afraid, but was "straight faced," although she did seem a little "uneasy."
Detective David Robinson of the Caddo Parish Sheriff's Office testified next. He conducted an audio and videotaped interview with Mr. Hendrick on November 13, 2006. Mr. Hendrick's lawyer was present during the interview. A few significant points from this interview, as related by Det. Robinson, are that Mr. Hendrick said that showering with his daughter every day was normal in his household and, initially, he said he would do this until she reached puberty. Later, Mr. Hendrick changed that to 8 years old, but told the detective that he would shower and bathe her if she was 19 and came home intoxicated. The court clarified during this testimony, however, that Mr. Hendrick did not reference taking his own clothes off, but merely showering the daughter. Mr. Hendrick was inconsistent in his statement regarding bathing the child as well. First, he said that she would wash herself and he did not touch her. Later he admitted that he would use a sponge to wash her vagina and her "bottom." He also told the detective, without further explanation, that his addiction "has a sexual aspect to it."
Detective Robinson testified about his investigation and, specifically, stated that he had talked with Ms. Hendrick and her parents, the Driggers, at the Gingerbread House on November 6, 2006. Mr. Driggers informed him that Mrs. Driggers had observed A.H. putting a McDonald's toy in her vagina. A.H. then told Mrs. Driggers that her father had put his fingers inside of her. Mr. Driggers related this to Det. Robinson and, further, told him that Mrs. Driggers had informed Ms. Hendrick of this incident shortly after it occurred. Ms. Hendrick, however, denies this as explained above.
In addition, Det. Robinson testified that Ms. Hendrick gave him a pink clothes hanger in a paper bag that she said she found in the back of her husband's closet. Ms. Hendrick told the detective that, when A.H. saw the hanger, she told her mother that that was the "pink trophy" that daddy uses. A buccal swab was done on the hanger, but no results are provided in the record.
*459 No criminal charges were filed in this matter because of a lack of physical evidence according to Det. Robinson. When the judge was questioning the detective about the district attorney's decision not to prosecute, the detective said that the decision not to prosecute was made before the test results were received from the DNA test on the hanger. As stated, however, there are no results of the DNA test referenced in the record. According to Ms. Hendrick, the pink hanger was not the pink stick. Ms. Hendrick told Detective Robinson that A.H. said it was notthere was no confirmation of this from the child herself.
Thomas Hendrick, Mr. Hendrick's 17-year-old son from his first marriage, testified next. He confirmed that it was normal for him to shower with his father up until age 11. He denied that it was sexual in nature or that anything inappropriate happened during the showers. He described an on and off relationship with his father and stated that they have not been close in several years. Thomas' mother and Mr. Hendrick's first wife, Suzanne Futch, testified about the volatile nature of their marriage. She described Mr. Hendrick's habits of smoking marijuana in front of the children when she was not at home and his physical and verbal abuse of her. She also testified that he was arrested for shoplifting with the children and was turned in to Child Protective Services by Thomas' teacher after beating him for not understanding his homework.
Jennifer Flippo, child psychologist and forensic interviewer at Gingerbread House, testified concerning her interview of A.H. The court accepted her as an expert in forensic interviewing. She testified that, in about 80 per cent of the cases, there is no physical evidence of sexual abuse in children. The lack of physical evidence in this case does not affect her procedure.
Our review of the recorded interview revealed a very bright and articulate four-year-old. A.H. was busy coloring and drawing during the interview and never made eye contact with Ms. Flippo while answering questions. Ms. Flippo asked the same types of questions repeatedly, with A.H. answering in a very nonchalant and unaffected manner. On the dvd, the child did not appear surprised or particularly interested in the questions posed by the interviewer; however, A.H. expressly confirmed that her daddy had put a pink stick in her butt. She denied having ever seen her daddy naked except while he was "getting ready." A.H. described the "pink stick" as something other than a toy and stated that it did not matter where it was, that her daddy would always find it. A.H. was able to correctly circle appropriate body parts when asked to do so and, specifically, referred to both female and male genitalia as "butts." When asked on two occasions (not in succession) how many times her daddy had put the pink stick in her butt, A.H. counted rapidly "1 2 3 4 5 6 7 8 9."
Mark Swan, a computer analyst, was hired by Ms. Hendrick to determine what was contained in one of Mr. Hendrick's computers. Mr. Swan testified briefly that there were sexual images on the computer, but he could not confirm if the images were of underage women or teenagers.
Christy, Ms. Hendrick's sister, testified next and described the conversation she had with A.H. in the bathtub on November 3, 2006. She stated that she sensed something was wrong because A.H. did not want to see her father after he left the home the week before. She asked A.H. if her daddy hurt her, to which A.H. replied, "yeah." After similar questions, A.H. stated that "daddy dug his fingers in my butt." *460 Christy testified that, after this, A.H. became more vocal about the abuse and talked about the pink stick and the act of putting the lemon flavored tootsie roll on a hanger, inserting it in his butt and either eating it or making A.H. eat it.
Briefly, the director of the daycare testified that she had not observed A.H. to be an untruthful child or an exaggerator.
Dr. Jennifer Rodriguez, pediatrician at LSU, was qualified as an expert in child sexual abuse. She examined A.H. on November 7, 2006. The exam was normal, showing no signs of sexual abuse in the hymen, vagina or rectal areas. There was no scarring or signs of previous trauma. Dr. Rodriguez testified that damage from sexual abuse, such as a tear in the hymen, can heal in a week and show no signs of trauma on examination. She opined that often, in 85 to 90 percent of cases, even when there has been abuse, the exam is normal.
Several other witnesses, however, testified that the above evidence provided the basis for the judge's ruling. On January 8, 2007, the trial judge issued his oral ruling finding by a preponderance of the evidence that Mr. Hendrick abused A.H. and a protective order was issued until A.H.'s 18th birthday. The court assumed exclusive jurisdiction as A.H. was found to be a child in need of care based on the sexual abuse. Sole custody was awarded to Ms. Hendrick. Mr. Hendrick received supervised visitation conditioned on his obtaining a sexual perpetrator evaluation and follow recommendations therefrom; obtaining a substance abuse evaluation and following recommendations for treatment along with submitting to random drug screens; and obtaining a mental health evaluation and following recommended treatment. Mr. Hendrick was ordered to pay all the costs of court, reasonable attorney fees and the costs of A.H.'s counseling. Mr. Hendrick appeals.

DISCUSSION

Abuse of discretion in finding sexual abuse
In his third assignment of error, Mr. Hendrick challenges the trial judge's finding by the preponderance of the evidence that he sexually abused A.H. He focuses on the lack of physical evidence and, in his opinion, the unreliability of videotaped interview. Mr. Hendrick further asserts that all of the testimony of A.H., Ms. Hendrick and Christy should be discredited for various reasons, but particularly, that the divorce petition was filed after the petition for protection and mentioned nothing about the abuse. The crux of his argument is that Ms. Hendrick and Christy knew there would be a custody battle and created this story to aid their position. He maintains that the abuse allegation was told to A.H. by her mother and that A.H. simply repeated what she heard her mother tell her had happened.
Mr. Hendrick also emphasizes these inconsistencies in Christy's testimony regarding what time of day she bathed A.H. According to Mr. Hendrick, the inconsistencies should totally discredit her testimony.
Mr. Hendrick next attacks the statements made by A.H. He notes that A.H. was with her mother's family for four days following the filing of the petition for protection and during that time she was repeatedly questioned about the allegation of abuse. He submits that the original alleged statement that he "dug his fingers in [A.H.]'s butt" expanded to include a pink stick, trophy, fork and coat hanger over the course of the time Ms. Hendrick's family was going over the story with A.H. He notes Dr. Rodriguez's testimony that, *461 when a child is repeatedly asked leading questions, the child can be become confused about what really happened. Mr. Hendrick cites inconsistencies in A.H.'s answers in the taped interview. For example, he asserts that her first answer to the question of whether or not he ever touched her butt was "no" and she also answered "no" to the first time she was asked if he "put a pink stick in her butt." After repeated questioning with the same questions, her answers changed. According to Mr. Hendrick, this is totally unreliable testimony from such a young child.
Finally, Mr. Hendrick adamantly challenges the introduction of evidence he considers irrelevant, such as his drug abuse in the past. He argues that his past drug abuse, rehabilitation and sexual activity with women has no bearing on the question of whether or not he abused A.H. He asserts that the judge abused his discretion in relying on irrelevant evidence. He also notes that A.H. is not overly emotional or displaying the type of deviant behavior that would be indicative of abuse. He points out that A.H. would not look directly at Ms. Flippo when she answered her questions during the interview, and that was an indicator that she was not providing truthful answers.
Ms. Hendrick, however, asserts that, as an evidentiary matter, she carried her burden of proving by a preponderance of the evidence that Mr. Hendrick abused A.H. She argues that the only person not to be credited as truthful in this case is Mr. Hendrick.
To obtain a restriction or suspension of Mr. Hendrick's visitation rights, under either the Civil Code or the Children's Code, on the ground that A.H. was sexually abused by him, Ms. Hendrick was required to prove sexual abuse by Mr. Hendrick by a preponderance of the evidence. La. C.C. art. 136; La. Ch. C. art. 617(A), (B). We must affirm the trial court's finding that this is the case unless it is manifestly erroneous. An appellate court cannot set aside a juvenile court's findings of fact in the absence of manifest error or unless those findings are clearly wrong. In re A.J.F., 00-0948 (La.6/30/00), 764 So.2d 47. Under this standard, if there are two permissible views of the evidence, the fact finder's choice between them cannot be manifestly erroneous or clearly wrong. Rosell v. ESCO, 549 So.2d 840 (La.1989). A finding is manifestly erroneous only if it has no reasonable basis in the record viewed in its entirety. Stobart v. State, DOTD, 617 So.2d 880 (La. 1993).
After considering the testimony of Ms. Hendrick and Christy, along with the statements made by A.H. to Ms. Flippo at the Gingerbread House, we cannot say that the trial court manifestly erred in its conclusion in this case. As discussed in detail supra, A.H. offered substantially the same account of actions of her father in answer to questions posed by Ms. Flippo as she did to her aunt. We note the concern of the trial judge regarding the interviewing technique and we do not discount Mr. Hendrick's characterization of A.H. as unemotional or rehearsed during the interview. We find significant, however, that A.H. was consistent and unwaivering on the most critical fact in this determination, i.e., that her father had touched her private areas with his finger and the "pink stick."
Moreover, we will not disturb the trial judge's credibility determination to believe Ms. Hendrick and Christy. According to these witnesses, the child reported the abuse to Christy, who immediately telephoned Ms. Hendrick, who immediately filed the petition for protection. Ms. Hendrick explained that her attorney had advised her that it was not necessary to *462 amend the divorce petition that she had verified earlier that morning, so it was filed by her attorney later in the day without mention of the abuse allegations. Admittedly, the timing of events of that day may seem suspect; however, Ms. Hendrick provided an explanation of the course of that day, which was believed by the trial judge. As stated, the fact finder is in the best position to judge the demeanor of the witnesses, therefore, we defer to his determination of credibility and will not disturb such on appeal.
Further, we do not find the absence of physical evidence of abuse to be determinative of sexual abuse of the child. As Ms. Rodriquez testified, it is not unusual for young victims of sexual abuse to not show any physical signs of trauma.
The State has a compelling interest in protecting children from sexual abuse. Globe Newspaper Co. v. Superior Ct. for Norfolk County, 457 U.S. 596, 102 S.Ct. 2613, 73 L.Ed.2d 248 (1982). We conclude that the trial judge's finding that Mr. Hendrick sexually abused A.H. and its entry of the protective order under La. Ch. C. art. 1564, et seq., was neither manifestly erroneous or clearly wrong. We do note, however, the trial judge significantly and expressly stated that the evidence in this case falls short of clear and convincing and he expressed concerns over several aspects of this case. In this regard, we believe it imperative to stress the juvenile's court continuing jurisdiction over A.H. as a child in need of care and, as such, we emphasize the trial judge's following comment made during his oral ruling in this case:
In this case supervised visitation is necessary and essential to assure the health, safety and welfare of this child pending Mr. Hendrick obtaining sexual perpetrator evaluation by Jerome Wilson and following recommended treatment. (Emphasis ours.)
As previously stated, it is the opinion of this court that any evaluations completed subsequent to the entry of the protective order would be relevant in any review hearing on the issue of visitation.
Our inquiry does not end here. As previously mentioned herein, Mr. Hendrick complains of the admission into evidence of Exhibit P-2.
Although we find the relevance of this historic information to be suspect, this record, when taken as a whole, supports the trial court's finding of sexual abuse. There is no indication that the trial judge afforded this writing any particular great weight, especially when there exists such strong evidence of Mr. Hendrick's sexually inappropriate behavior with A.H. in the form of A.H.'s own words during the interview with Ms. Flippo. Assuming, arguendo, that P-2 was improperly admitted, we do not find its admission to be reversible error.
Likewise, we do not find the trial court's refusal to appoint an independent mental health examiner to be reversible error. We are sympathetic to Mr. Hendrick's argument in this regard; however, we are constrained by the standard of review and an appellate court cannot disturb the findings of the trial court simply because it may have decided the matter differently had it been sitting as the finder of fact. In sensitive and life-altering matters such as alleged sexual abuse of one's child, this panel does not dispute that independent psychological examinations may prove to be of tremendous benefit in deciding such difficult cases as this. It remains, however, within the trial judge's vast discretion to determine when such independent mental health examinations are warranted. See. La. C.E. art. 702. The trial judge, especially in the juvenile court setting, is vested with the responsibility and *463 discretion to decide emotionally charged and important issues such as sexual abuse and we defer to the trial judge's decision in the instant matter.

CONCLUSION
For the foregoing reasons, the protective order is affirmed. Costs of appeal are assessed against Johndale Hendrick.
AFFIRMED.
NOTES
[1] The Petition for Protection From Abuse was filed on November 3, 2006, at 11:41 a.m. The Petition for Divorce was filed November 3, 2006, but the time stamp portion has been cut off by photocopying. The testimony, however, indicates that it was filed at 4:25 p.m.