STEWART, J.
 

 liThe defendant, Roger Berry, appeals a judgment granting a protective order against him under the Domestic Abuse Assistance provisions of the Louisiana Children’s Code, Articles 1564-1575. Because the record supports the trial court’s imposition of the protective order, we affirm.
 

 FACTS
 

 On February 5, 2008, the plaintiff, Michael J. Newton, filed a petition for protection from abuse on behalf of his minor daughter, B.N., who was then four years old. As alleged in the petition, B.N. re
 
 *263
 
 ported that Roger Berry, her stepfather, entered the bathroom and urinated while she and sister, H.L., were bathing and that he had taken off his clothes and gotten into the bed with the girls when their mother was not home. The petition also related that B.N. is afraid of Berry and that he spanks her.
 

 Finding probable cause to believe B.N. to be a child in need of care because of alleged sexual abuse, the juvenile court judge signed a temporary restraining order prohibiting Berry from having contact with B.N. Also, Berry was ordered to show cause why he should not be held in contempt of court for violating a protective order issued on August 22, 2007, prohibiting him from interfering with the communications between B.N.’s parents, Michael Newton and Sheri Berry. An attorney was appointed to represent the minor child.
 

 Protective Order Proceedings
 

 The hearing on the protective order took place on February 29, 2008, and August 22, 2008. Michael Newton testified that he and Sheri Berry share custody of B.N. on a seven-day schedule. While in Newton’s custody |gon February 3, 2008, B.N. told him and his sister that she had seen “a boy pee.” She identified the boy as “Daddy Roger.” She also said that he had gotten into the bed with her while he was naked and tickled her. Newton said that B.N.’s statements came “out of the clear blue.” He denied coaching her. Newton admitted to disliking Berry, wishing him harm, and saying that he is a bad man on many occasions in B.N.’s presence.
 

 Carrie Grohalski, Newton’s sister, was living with him and heard what B.N. said about Berry. When Grohalski asked B.N. where her mother was when Berry did these things, B.N. said that she was either at grandma’s or in the bathroom. Grohal-ski denied that she and Newton initiated the conversation with B.N. about Berry, and she stated that she did not consider B.N. to be a child who makes up stories. Grohalski recalled that B.N. said on nu- ' merous occasions that Berry is mean and spanks her.
 

 Newton’s other sister, Leona “Lonnie” Hammons, testified that B.N. reported similar things to her about Berry while staying with her on February 6 and February 7. B.N. told Hammons that Berry had taken off his clothes, gotten into the bed with her, and tickled her stomach. B.N. said her mother was not home when this happened. Hammons also claimed that B.N. later told her twice that Berry had touched her private area.
 

 Jennifer Flippo, an expert in forensic interviewing, conducted a taped interview with B.N. on February 8, 2008, at the Gingerbread House. Flippo testified that B.N. said that Berry was mean and spanked her with a belt. B.N. also said that Berry had taken off his clothes and gotten into bed with her when her mother was gone and that he had used the bathroom while she |sand her sister were bathing. B.N. told Flippo that her mother knew about these occurrences. The only touching reported by B.N. was that Berry had tickled her stomach.
 

 Flippo found no reason to disbelieve B.N. She was particularly concerned about an adult male taking off his clothes and getting into bed with a child. Flippo described such conduct as part of a “grooming” process by which a potential molester begins with small instances and builds up to more serious behaviors. However, Flip-po admitted that she could not say whether that was Berry’s intention, and she agreed that tickling could simply be playing. Flippo later clarified that B.N. discussed the bed instance and tickling as one episode and explained that the occurrence of the two together presented a wholly
 
 *264
 
 different dynamic from what would be considered playing. Though Flippo was not alarmed about the report of Berry entering the bathroom to urinate while B.N. and her sister bathed, we note that the trial coui't disagreed with her opinion on this behavior.
 

 When questioned about the possibility of a parent influencing B.N. to say these things about Berry, Flippo answered that Newton’s negative comments about Berry could to some, extent influence B.N. However, she did not believe that Newton’s negative remarks would have caused a young child like B.N. to fabricate stories of a sexual nature about Berry. Flippo found no indication that B.N. was influenced by her father to make up stories about Berry.
 

 Sheri Berry described B.N.’s relationship with Berry as “wonderful.” She denied knowing about any inappropriate occurrences. Explaining that |4she runs errands during the day while Berry is at work, Sheri insisted that she never leaves the girls alone with Berry. She later clarified that the girls might be left alone with him in one room while she is in another. Sheri also claimed that the B.N. and her sister, H.L., never slept together, but she later said that they occasionally slept together on weekends.
 

 Sheri explained that she was present when the bathroom incident reported by B.N. occurred. According to Sheri, she was washing the gii’ls’ hair in the bathtub when Berry entered to use the bathroom. Because a wall separates the tub from the toilet, only his back was visible to the girls. Sheri testified that the other bathroom in the home was inoperable at the time and that she assumed he had some emergency that prevented him from waiting until the girls were done in the bathroom.
 

 Roger Berry also testified about the great relationship he has with B.N. He stated that she is the first to hug him when he gets home from work and that Sheri sometimes has to hold her back for him to get inside. Berry denied the allegation that he got into bed naked with B.N., and he denied any inappropriate touching. He stated that the girls only sleep together on weekends when they ask him to make a tent or arrange a pallet on the floor. Otherwise, they have to sleep in their own rooms. He asserted that the girls would never even be in a bed together during the day. Like Sheri, he also testified that he is never left alone with the girls, but he later admitted that he had been left alone with them in a room while Sheri was elsewhere in the house.
 

 | .-¡Berry admitted that he did use the bathroom in the girls’ presence. He described the layout of the bathroom and said that only his back would have been visible to B.N. and her sister. It was his belief that the stories told by B.N. about him had been “planted in her head” by Newton.
 

 Rhonda Newton Aaron, Newton’s ex-wife, also testified on behalf of Berry. Rhonda and Newton began living together in July 2007, married on August 4, 2007, and separated in October 2007. She denied that her short relationship with Newton was contentious and indicated that she feels indifferent toward him. Rhonda testified that Newton hated Berry and frequently said in B.N.’s presence that Berry was bad and mean. However, B.N. never seemed scared of Roger Berry and was always ready to return to the Berry home. Rhonda claimed that Newton asked her for assistance in finding a hit man to kill Berry. Specifically, he allegedly asked if her former husband, who rode with the “Ban-didos,” could have Berry “taken care of.” Rhonda also claimed that Newton talked about planting drugs in Berry’s car or home and wanted to have nude photo
 
 *265
 
 graphs of Sheri posted on a website. Rhonda never told the Berrys or the police about Newton’s alleged plots.
 

 Dr. Deborah Brown, an expert in child sexual abuse counseling, testified on behalf of B.N. Dr. Brown had approximately
 
 25
 
 sessions with B.N., beginning in August 2007. It appears from the record that B.N. was referred to counseling after some type of injury occurred, though the record is not clear on the details. According to Dr. Brown, Sheri accompanied B.N. and took over the sessions. Dr. Brown eventually realized that B.N. |(iwas reluctant to talk in her mother’s presence and that Sheri influenced B.N.’s behavior. At one session, B.N. told Dr. Brown that her mother wanted her to say that Berry is nice and that she was not allowed to watch “tv.” in the van if she did not say it. B.N. mainly complained that Berry whipped her.
 

 At a session immediately after B.N.’s interview with Flippo, B.N. told Dr. Brown about Berry getting into bed with her while he was naked. According to Dr. Brown, B.N. entered, began playing with some figures, and then started talking about what Berry had done without being prompted by questioning. Dr. Brown noted that B.N. was with her father that day and that he, unlike Sheri, did not stay with B.N. during the session.
 

 When questioned about the possibility of these incidents being planted in B.N.’s mind, Dr. Brown explained that she would be suspicious if a child came to therapy and immediately began talking about incidents using language a child would not ordinarily use or describing what happened in a rote fashion. While B.N. began talking about what Berry did without being asked anything, Dr. Brown did not believe that B.N. had imagined or fabricated the incident. Dr. Brown testified there was nothing automatic about B.N.’s speech and nothing to indicate that she had been coached by her father. In sum, Dr. Brown believed there was validity to B.N.’s claims about Berry, and she believed that B.N. was very scared of him.
 

 Finally, the children testified in chambers. B.N. said that Berry is mean and that he spanks her. She indicated that she had seen him naked. |7B.N. also said that Berry went “potty” while she and her sister were taking a bath and that he tickled her on the belly when she was in her bed.
 

 H.L., the daughter of Sheri Berry and half-sister of B.N., was eight years old when she testified. She admitted that Berry once used the bathroom while she and B.N. were taking a bath, but she said he had his back to them. She was “absolutely, positively certain” that he had never gotten into bed with them while naked. She also testified that Berry is never alone with B.N., and explained that the girls always follow their mother. She said that she and B.N. sleep in their own beds unless Berry makes a pallet on the floor for them or sets up a tent. She also stated that Berry is nice, that he fixes their dinner plates, that he does not spank them with a belt, and that he tickles them on the feet, neck and underarm area.
 

 When questioned by counsel for Newton, H.L. stated that her mother and Berry went over possible questions and her answers at least three times. She also admitted to having been alone with Berry on some occasions. When the judge asked her more about why her mother and Berry went over her testimony with her, H.L. indicated it was to make sure she did not forget anything or get mixed up. She specifically indicated that they went over questions about the bathroom incident and about whether Berry was ever seen naked.
 

 
 *266
 
 The record indicates that the trial judge and counsel for the parties also reviewed the DVD recording of Flippo’s forensic interview of B.N. at the Gingerbread House.
 

 IsAfter hearing arguments, the trial judge granted the protective order effective from September 30, 2008. The order prohibits Berry from having any contact with B.N. until February 6, 2021. He was not held in contempt for violating the prior order. Berry’s appeal followed.
 

 DISCUSSION
 

 Berry argues that the trial court improperly considered the Gingerbread House recording and that the evidence was insufficient to support the issuance of the protective order. He also complains that Newton did not establish the requirements for issuance of the protective order by clear and convincing evidence.
 

 The trial court issued the protective order under the Domestic Abuse Assistance provisions of the Louisiana Children’s Code, articles 1564-1575. The issuance of a protective order under these provisions requires proof of the allegations of the petition by a preponderance of the evidence. La. Ch. C. art. 1569(B) and (D);
 
 Hendrick v. Hendrick,
 
 42,566 (La.App.2d Cir.8/22/07), 964 So.2d 454. We find no merit to Berry’s argument that Newton had to prove the allegations of the petition for protection from abuse by clear and convincing evidence.
 

 We must now determine whether the issuance of the protective order against Berry was supported by a preponderance of the evidence. Our review focuses on whether the trial court abused its discretion in granting the protective order.
 
 Culp v. Culp,
 
 42,239 (La.App. 2d Cir.6/20/07), 960 So.2d 1279,
 
 unit not considered,
 
 2007-1836 (La.10/5/07), 964 So.2d 378.
 

 loThe stated purpose of the Domestic Abuse Assistance law is to “provide a civil remedy in the juvenile courts for domestic violence in the homes in which children reside which will afford the victim immediate and easily accessible protection.” La. Ch. C. art. 1564. This law seeks to provide a remedy against domestic abuse, which
 

 includes but is not limited to physical or sexual abuse and any offense against the person as defined in Chapter 1 of Title 14 of the Louisiana Revised Statutes of 1950, except negligent injury and defamation, committed by one family or household member against another.
 

 La. Ch. C. art. 1565(1). Stepparents are included as family or household members. La. Ch. C. art. 1565(2).
 

 Berry argues that there was no evidence of physical abuse and that the acts complained of were not shown to be sexual abuse or offenses against the person as required under La. Ch. C. art. 1565, particularly indecent behavior with a juvenile. He contends that B.N.’s stories about him are suspect and uncorroborated. He suggests that B.N. was coached to say these things about him by Newton, who admitted to hating him and who always made derogatory statements about him in B.N.’s' presence.
 

 Having carefully reviewed the testimony presented at trial in light of the Domestic Abuse Assistance provisions, we find no abuse of discretion by the trial court in granting the protective order. We note that domestic abuse is defined expansively as including,
 
 but not being limited to,
 
 physical and sexual abuse and offenses against the person set forth in Chapter 1 of Title 14 of the Louisiana Revised Statutes. The acts attributed to Berry, particularly that of getting into bed while naked
 
 *267
 
 with a young girl, can easily | inbe included under the ambit of domestic abuse. Such behavior appears to constitute grooming, as that term was explained by Jennifer Flippo, and we find nothing in the law that would require the courts to ignore such behavior and leave a child at the mercy of the perpetrator until more harm is done. We reject Berry’s attempts in his brief to equate his conduct with instances where a young child might accidentally come upon a parent in a state of undress, and we find ludicrous his reference to nudists as an excuse for his conduct.
 

 Moreover, we find that Berry’s conduct does appear to constitute indecent behavior with a juvenile, which includes any lewd or lascivious act upon or in the presence of a child done with the intent of arousing or gratifying the sexual desires of either person. La. R.S. 14:81(A)(1). This court has defined “lewd” as lustful, indecent, and signifying a form of immorality relating to sexual impunity carried on in a wanton manner, and “lascivious” as indecent, obscene, and tending to incite lust and to deprave the morals with respect to sexual relations.
 
 State v. Sturdivant,
 
 27,680, p. 6 (La.App. 2d Cir.2/28/96), 669 So.2d 654, 658. The act of an adult male disrobing, getting into bed with a young girl, and tickling her stomach cannot be considered anything other than lewd and lascivious behavior intended to arouse or gratify his sexual desires.
 

 As shown by the record, B.N. related this occurrence along with the fact that Berry relieved himself in front of her and her sister while the two girls were in the bathtub to her father, her two aunts, Jennifer Flippo, and Dr. Brown. Her testimony in chambers was substantially the same. Neither |T1 Flippo nor Dr. Brown found any indication that B.N. had fabricated these things or that she had been coached or otherwise influenced by her father. Newton admitted to his great dislike of Berry. However, neither his antagonism toward Berry nor the suspect testimony of Newton’s ex-wife, who was not shown to have any significant contact or relationship with B.N., casts doubt on B.N.’s otherwise consistent telling of what happened to her. In fact, the only evidence of coaching related to the Berrys’ coaching of H.L., who told the court that they went over questions and answers with her to make sure that she was positive and did not get “mixed up.”
 

 We observe that both Berry and Sheri Berry admitted to the bathroom incident. Their admissions establish that B.N. was not lying when she told her father and aunt that she “saw a boy pee” and that it was “Daddy Roger.” The fact that B.N. was truthful about the bathroom incident lends credence to her claim that “Daddy Roger” got into her bed while he was naked and tickled her stomach. We also observe that the Berrys’ credibility was called into question by their insistence that Roger Berry was never alone with the girls. On cross, both Roger and Sheri had to clarify their testimony to admit that he is at times alone in a room with the girls when Sheri is in another room. Moreover, their testimony was contradicted by H.L. who admitted that she and B.N. had stayed home with Roger on some “really short occasions” and that she had accompanied him to work, to the doctor, and to the dump.
 

 Based on our review, we find that the trial testimony establishes the allegations of the petition for protection from abuse by a preponderance of l^the evidence and provides sufficient cause for the trial court’s issuance of the protective order.
 

 Berry also complains that the trial court abused its discretion in reviewing the DVD without it having been properly introduced into evidence. He argues that the protec
 
 *268
 
 tive order should be vacated due to the trial court’s improper consideration of the DVD.
 

 The trial court refers to the DVD in his reasons for judgment. However, appeals are taken from the judgment, not from the reasons for the judgment.
 
 Greater New Orleans Expressway Com’n v. Olivier,
 
 2002-2795 (La.11/18/03), 860 So.2d 22. The record shows that the DVD was never actually admitted into evidence. Counsel for B.N. sought to introduce the DVD after the trial court asked whether it had been admitted. Counsel for Berry objected on the grounds that no foundation had been laid for its admission. However, the DVD was a recording of Flippo’s forensic interview with B.N. Flqopo testified that the interview was recorded, and her testimony was based on her interview with B.N. In light of Flippo’s testimony, the admission of the DVD would have been cumulative evidence. The trial court allowed the parties to go view the DVD, and then the trial court viewed it before ruling on the matter. Under these facts, Berry was not prejudiced by the trial court’s consideration of the DVD.
 

 Lastly, the case law cited by Berry does not support his argument. In each case, the basis of the trial court’s judgment was its consideration of matters not admitted into evidence. In
 
 Robert S. Robertson, Ltd. v. State Farm Ins. Companies/State Farm Fire and Cas. Companies,
 
 05-435 (La.App.13 5th Cir.1/17/06), 921 So.2d 1088, the tidal court’s ruling on an arbitration award was based on its review of an insurance policy. However, neither the policy nor the applicable provisions were admitted into evidence as required to prove the existence of the policy, its coverage, or exclusions. In
 
 State v. Young,
 
 99-1310 (La.App. 1st Cir.4/17/00), 769 So.2d 12, an habitual offender adjudication was improperly based on
 
 Boykin
 
 transcripts ordered by the trial court after taking the matter under advisement. Finally, in
 
 City of Eunice v. CLM Equipment Company, Inc.,
 
 505 So.2d 976 (La.App. 3d Cir.1987), the trial court’s judgment finding the defendant liable for sales and use taxes was based on a city ordinance that was not proven in court or made part of the record.
 

 While it appears the DVD was not part of the record, it was also not the sole basis for the trial court’s ruling. The trial court’s ruling was based on and supported by the trial testimony, including that of Flippo and B.N. The DVD was cumulative and not necessary to prove the allegations in this matter in which the trial testimony more than sufficed to support the issuance of the protective order.
 

 CONCLUSION
 

 For the reasons explained, we affirm the trial court’s judgment granting a protective order against the defendant, Roger Berry. Costs of appeal are assessed to the defendant.
 

 AFFIRMED.